FILED'09 APR 30 15:14USDC-ORM

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

JAMES KELLY,

                Plaintiff,

      v.

IRONWOOD COMMUNICATIONS
INC., a Nevada Corporation,

            Defendant.

Case Number CV 08-3058-CL

**ORDER**

Clarke, Magistrate Judge:

Plaintiff James Kelly, an Oregon resident, filed this complaint against Defendant Ironwood Communications, Inc., a Nevada Corporation, for unlawful employment practices, claiming retaliation for filing a workers compensation claim ("WC claim") in violation of Or. Rev. Stat. 659A.040 and refusal to reemploy in violation of Or. Rev. Stat. 659A.046. This court has jurisdiction pursuant to 28 U.S.C. § 1332 because the action involves a controversy between citizens of different states. Defendant removed the case under 28 U.S.C. § 1441. The amount in controversy at the time of removal exceeded $75,000, exclusive of interest and costs. (Notice of Removal ¶4.)

Defendant filed this motion for summary judgment. For the reasons set forth below, the motion is granted as to the claim for reemployment and denied as to the claim of retaliation.

I.      **Standards for Summary Judgment**

Pursuant to Rule 56(c), summary judgment "should be rendered, if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); see Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 636 (9th Cir. 2002).

The court cannot weigh the evidence or determine the truth but may only determine whether

there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir.

2002). An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th

Cir. 2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party must carry the initial burden of proof. Celotex Corp. v. Catrett, 477

U.S. 317, 322-24 (1986). The moving party meets this burden by identifying for the court

portions of the record on file which demonstrate the absence of any genuine issue of material

fact. Id.; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). In assessing

whether a party has met its burden, the court views the evidence in the light most favorable to the

non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). All

reasonable inferences are drawn in favor of the non-movant. Gibson v. County of Washoe, 290

F.3d 1175, 1180 (9th Cir. 2002).

If the moving party meets its burden with a properly supported motion, the burden then

shifts to the opposing party to present specific facts which show there is a genuine issue for trial.

Fed. R. Civ. P. 56(e)(2); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 & n.4 (1986). Summary judgment should be

Order   2

granted for the movant, if appropriate, in the absence of any significant probative evidence

tending to support the opposing party's theory of the case. Fed. R. Civ. P. 56(e); <u>THI-Hawaii,</u>

<u>Inc. v. First Commerce Fin. Corp.</u>, 627 F.2d 991, 993-94 (9th Cir. 1980); <u>First Nat'l Bank v.</u>

<u>Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968).  Conclusory allegations, unsupported by factual

material, are insufficient to defeat a motion for summary judgment.  <u>Taylor v. List</u>, 880 F.2d

1040, 1045 (9th Cir. 1989).  Instead, the opposing party must, by affidavit or as otherwise

provided by Rule 56, designate specific facts which show there is a genuine issue for trial.

<u>Devereaux</u>, 263 F.3d at 1076.

## II.    Facts

Considering only those facts relevant to the Court's ruling on the motion, a review of the

record reveals the following:

Plaintiff began working for Ironwood as a satellite installer ("installer") on or about

December 11, 2004.  (Decl. of Jennifer Mora in Support of Def.'s Mot. for Summ. J. ("Mora

Decl."), Ex. 1, 2.)  As an installer, Plaintiff's primary job was to install satellite service for

residential and commercial customers and also to service and maintain satellite systems. (CSMF

at ¶ 2.)  Although Plaintiff reported to Mike Prill, the Operations Manager who works in

Medford, Oregon, Plaintiff was a "remote" installer and worked primarily from his home near

Klamath Falls, Oregon.  (Declaration of Mike Prill in Supp. of Def.'s Mot. for Summ. J. ("Prill

Decl.") at ¶ 3.)   Installers are required to drive substantial distances between customer locations.

On average Plaintiff drove approximately 200 miles per day, spent approximately one to three

hours per day climbing ladders to install the equipment on a roof, and was required to crawl in

small spaces under the home.  <u>Id.</u>

Order   3

On November 12, 2005, Plaintiff was involved in an automobile accident while driving an Ironwood van. (CSMF at ¶ 4.)  Plaintiff was injured and taken to the hospital. (CSMF at ¶ 4.) He sustained a compensable injury from this work related accident.  (Pl.'s Resp. to CSMF at ¶ 9.) Shortly thereafter, Plaintiff filed his workers compensation claim ("WC claim"). Id.  Hanifah Chiku worked for Ironwood Communication's parent company, 180 Connect, and was one of the claims administrators for Plaintiff's WC claim.[1] ( Resp. to CSMF at ¶ 10.)

After the November 12, 2005 accident, Plaintiff submitted a number of doctor's notes to Ironwood regarding his inability to perform the duties of installer.  First, in a note dated November 30, 2005, Plaintiff's physician prohibited him from doing any work until December 13, 2005.  (CSMF at ¶ 5.)  On December 13, 2005, Plaintiff's physician extended his leave of absence through January 3, 2006. Id. On December 15, 2005, the Defendant's third party workers compensation administrator Liberty Mutual ("Liberty") accepted Plaintiff's cervical and thoracic strains as compensable injuries.  (Resp. to CSMF at ¶ 10.)

On January 3, 2006, Plaintiff submitted another note from his doctor, which restricted him to modified work. (CSMF at ¶ 6.)  According to Plaintiff's physician, Plaintiff could not lift more than 20 pounds whatsoever, although he could lift between 10 and 19 pounds for less than three hours.  He was not to crawl or climb. Id.  Plaintiff was also restricted from sitting for more than one hour at a time. Id.  Because the installer job requirements exceeded these restrictions, Plaintiff was unable to work in this position. Id.

Upon receiving this information, Ironwood offered Plaintiff a modified quality control

---

[1] Parties appear to disagree as to whether Ms. Chiku was the only claims administrator. See Def.'s Reply to CSMF at ¶ 11.  This dispute, however, is not relevant to the court's order.

position in Douglas, Lane, and Coos Counties, Oregon on January 27, 2006. (CSMF at ¶ 7.)
Plaintiff refused this position because the job was at a site more than 50 miles away and because
it required him to sit for periods of time exceeding an hour. Id. In response, Ironwood offered
Plaintiff a similar modified quality control position in Klamath, Modoc, Lake, and/or Jackson
Counties. Id. Plaintiff accepted this position and returned to work in March 2006. Id. The
Parties disagree as to whether this was a temporary position.[2] (CSMF at ¶ 7; Pl's Resp. to CSMF
at ¶ 3.)

On May 19, 2006, Liberty requested that Plaintiff attend an independent medical
examination ("IME") with Dr. George McNeill. (CSMF at ¶ 8.) At the conclusion of the exam,
Dr. McNeill determined that Plaintiff's medical conditions of cervical and thoracic strains, as
accepted in the WC claim, were medically stationary. Id. Dr. McNeill stated, "At this time His
work capacity is that of light duty. However, I think that he can do his regular job." (Decl. of
Jennifer Mora in Support of Def.'s Mot. for Summ. J. (Mora Decl.) , Ex. 16, 10.)

Upon learning of the results of the IME, Plaintiff's physician Dr. Reischer sent Liberty a
letter with her opinion of the status Plaintiff's medical condition. She stated, "I disagree with the
report in its entirety." She explained that since the date of Plaintiff's IME, he had another
thoracic MRI, "which shows disk [sic] herniation at T5-6 and T7-8 and in the opinion of the
neurosurgeon Dr. Maraire, these are likely the cause of his pain and there are further treatments
available for this." Dr. Reischer described Plaintiff's limitations and concluded that he should

---

[2] There is some confusion about the job title of this position. Defendant argues that the position was
temporary and Plaintiff disagrees. There is no formal job description in the record; however, there is a description of
physical requirements included in the document entitled "Temporary Light/Modified Duty Job Analysis" that Ms.
Chiku sent to Plaintiff's physician in conjunction with the Plaintiff's WC claim. (Mora Decl., Ex. 12.) This
document described the duties of the job titled "Modified Quality Control" for the purpose of Dr. Reischer's
approval. In addition, the parties also refer to this position as the "light duty position."

Order   5

still be on light duty.  "Because this compensable condition has not stabilized, I believe that Mr.

Kelly would benefit from a pain specialist with steroid injections intrathecally and further visits

with Dr. Maraire."  (Decl. of Carl Post in Opp. to Def.'s Mot. for Summ. J. (Post Decl.), Ex. F, 1-

2.)

Liberty Senior Claims Case Manager Kimberly Patterson sent Dr. Reischer a letter, dated

July 5, 2006, in which she asked Dr. Reischer to either agree or disagree with the IME conclusion

that the "cervical and thoracic strains have reached a medically stationary status."  Dr. Reischer

agreed that these two conditions were medically stationary but clarified, "I do not agree that Mr.

Kelly's claim should be compensable for only cervical and thoracic strains."   She also attached a

letter explaining that she suspected the November 12, 2005 accident caused disc herniations and

that these injuries were not medically stationary.  (Post Decl., Ex. P, 1-2.)

Ms. Patterson notified Ms. Chiku about Dr. Reischer's opinion.  (Post Decl., Ex. O.)  Ms.

Chiku communicated this to Plaintiff's supervisor Mr. Prill and Dana Wood in the Human

Resources department in an email dated July 11, 2006.  "[H]is treating physician feels that he is

NOT medically stationary for his thoracic pain complaints which she relates to this date of injury.

. . . Litigation is anticipated with this claim as more than likely James will disagree with the IME

position and push to have the thoracic symptoms added to this claim." (Post Decl., Ex. L.)

On July 12, 2006, Liberty notified Plaintiff that it was closing his claim. (Mora Decl., Ex.

14.)  In a July 17, 2006 letter, Defendant offered to reinstate Plaintiff as installer "without any

restrictions and at the wage you were receiving prior to this November 12, 2005 injury." (CSMF

at ¶ 9.)

On August 5, 2006, Plaintiff and his supervisor, Mr. Prill, discussed Defendant's request

Order   6

that Plaintiff return as an installer. Id. at ¶ 10.  Plaintiff stated that Dr. Reischer disagreed with

the IME conclusions that he could return to work and had not released him to full duty. Id.

Plaintiff further stated that it could take a "couple of years" to resolve the appeal of his workers

compensation award and that he might never be released to the installer position. Id.

The Parties further dispute the contents of this conversation.  Defendant asserts that

Ironwood requested that Plaintiff return to work.  Plaintiff disagrees,

> [Mike Prill] told me that Defendant would not continue to provide the light duty
> position for me.  He said I needed to return to my preinjury position or not come into
> work.  I told Mr. Prill that my doctor had not released me back to full duty and that
> I needed a position that met my medical restrictions.  Mr. Prill told me the company
> did not care about my medical restrictions and that I could sue them if I had a
> problem with their decision.  He said a light duty position would no longer be
> provided.

(Decl. of James Kelly  in Opp. to Def.'s Mot. for Summ. J. (Kelly Decl.) at ¶ 8-9.)  Defendant

placed Plaintiff on a leave of absence in August 2006. CSMF at ¶ 10.

Plaintiff requested that Liberty process his T5-6 and T7-8 disc herniations in his WC

claim on August 28, 2006, but Liberty denied that request on or about October 30, 2006.  (Resp.

to CSMF at ¶ 22.)  Plaintiff appealed, and on July 2, 2008, Administrative Law Judge Jenny

Ogawa ordered Liberty to accept Plaintiff's T7-8 disc herniation/protrusion. Id. at ¶ 23.  On

August 28, 2008, Liberty reopened Plaintiff's herniation/protrusion as a compensable injury

caused by the November 12, 2005 accident. Id. at ¶ 24.

## III.    Defendant's Motion for Summary Judgment on Plaintiff's Claim for Reemployment Is Granted

Plaintiff claims that Defendant refused to reemploy him in at least four suitable, available

positions in violation of Oregon law.

A.     **Injured Workers May Demand Reemployment When There Is a Suitable, Available Position**

Under Oregon law, "[a] worker who has sustained a compensable injury and is disabled from performing the duties of the worker's former regular employment shall, upon demand, be reemployed by the worker's employer at employment which is available and suitable." Or. Rev. Stat. 659A.046(1). A suitable position "meets the injured worker's medical restrictions and for which the worker possesses the necessary skills and abilities. . . . [and] is as similar as practicable to the worker's former position in compensation, duties, responsibilities, skills, location, duration (full or part-time, temporary or permanent) and shift. Or. Admin. R. 839-006-0135(3). An available position is one that is vacant. Or. Admin. R. 839-006-0135(2).

Employees placed in suitable, available positions are "entitled to remain in the position, provided the worker's restrictions continue to allow the worker to perform the duties of the position and the position is not eliminated for bona fide reasons." Or. Admin. R. 830-006-0135(5). An employee may be eligible to suitable, available employment for up to three years: "if a suitable position is not available at the time an injured worker's attending physician or authorized nurse practitioner finds the worker to be medically stationary but unable to perform the duties of the former position, the injured worker continues to retain the right to be reemployed in an available, suitable position for three years from the date of the injury . . . ." Or. Admin. R. 839-006-0135(6)(b).

When there is no suitable, available position, the employer is under no obligation to create one for the returning injured worker. In fact, if such position is created, the employer may discontinue it at any time. Or. Admin. R. 839-006-0135(6)(a). In addition, "[a]n employer is not

Order   8

required nor prohibited from offering a position that would promote the returning injured worker." Or. Admin. R. 839-006-0145(5).

**B.      There Was No Suitable, Available Position for the Plaintiff**

Plaintiff argues that there were at least four positions that were suitable, available positions and that Defendant violated his rights by not offering him these positions.  Plaintiff argues that the trainer position, the field technical supervisor position, the dispatcher position, and the modified quality control position were all suitable, available positions during the period in which he was eligible for reemployment. (Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J. ("Pl's Mem.") 14-16.)  Defendant argues that none of these positions meets the definition of a suitable and available. (Am. Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Am. Reply") 7.)

**1.      Trainer and Field Technical Supervisor Positions**

Defendant argues that the trainer and field supervisor positions are not suitable because each position has requirements that exceed the Plaintiff's limitations,[3] as prescribed by his doctor. Id. at 9.  Defendant provided a job description for the trainer position, which included the summary:  "[r]esponsible for training personnel in various field technical positions procedures in the cable system.  Will also monitor quality, training and day-to-day operations." (Prill Decl., Ex. 1, .)  Mr. Prill clarified in his declaration,

> [t]rainers must be able to perform each and every duty that Satellite Installers perform, including lifting and carrying heavy objects, climbing ladders, and crawling under customers' homes.  Trainers spend approximately 50 percent of their time driving to and from installation sites so that they can train employees as Satellite Installers. Unlike Satellite Installers, who are paid on a piece-rate basis, Trainers are

---

[3] As noted previously, Dr. Reischer placed the following limitations on the Plaintiff:  he could not lift more than 20 pounds whatsoever, he could lift between 10 and 19 pounds for less than three hours, could do no crawling or climbing, and was restricted from sitting for more than one hour at a time. (CSMF at ¶ 6.)

Order   9

paid on a salary basis and are considered management employees. Moving from a Satellite Installer job to a Trainer position is a promotion.

(Prill Decl. at ¶6.)

Similarly, the field technical supervisor is "[r]esponsible for managing various processes in the satellite markets. Will also monitoring [sic] quality, training and day-to-day operations." (Prill Decl., Ex. 2.) Mr. Prill explained,

> Ironwood considers the Field Technical Supervisor position to be a management position. Given the nature of the work, Field Technical Supervisors must also be able to perform each and every duty that Satellite Installers perform, including lifting and carrying heavy objects, climbing ladders, and crawling under customers' homes. Like Trainers, Supervisors spend approximately 50 percent of their time driving to and from locations where satellite equipment is being installed, so that they can monitor, supervise, and assist the Satellite Installers in their daily activities. Field Technical Supervisors are exempt management employees. Unlike Satellite Installers, who are paid on a piece-rate basis, Field Technical Supervisors are paid on a salary basis in the same respect as other management employees. Moving from Satellite Installer to a Field Technical Supervisor position is a promotion.

(Prill Decl. at ¶ 7.) Mr. Prill has both held these positions and supervised them at one time or another. (Second Declaration of Mike Prill in Supp. of Def.'s Mot. for Summ. J. ("2nd Prill Decl.") at ¶ 4-5.)

It follows, then, that because Plaintiff could not perform the basic requirements of the installer position, he could not perform the requirements for the trainer position, as described by the Defendant. In deposition, Plaintiff confirmed that he "was never released to go back to the job functions of the satellite installer position" and agreed that in order to perform the installer position, he must be able to "stoop, bend, crouch, crawl or climb." (Mora Decl., Ex. 1, 13.)

Defendant also argues that even if Plaintiff can show that they were "suitable" under statute, Defendant has no obligation to offer them under Oregon law because from their job

Order   10

descriptions and from Mr. Prill's explanations, these positions are promotions.  The employer is

not obligated to offer a suitable, available position that would result in a promotion.  <u>See</u> Or.

Admin. R. 839-006-0145(5).  Defendant has offered facts to suggest that these positions were not

suitable for the Plaintiff and has met its initial burden in moving for summary judgment.

Plaintiff disagrees and argues that there is a genuine issue of material fact concerning the

job requirements for both trainer and field technical supervisor positions.  (Pl.'s Mem. 16.)  To

support his argument, Plaintiff provides his own declaration, and states, "I believe I am qualified

to perform the Trainer position, the Field/Technical Supervisor [sic] Position and the Dispatcher

position. . . .  While I worked for Defendant Jim Klink was the Trainer.  The only work Jim

performed was classroom training, which did not require any heavy lifting.  All of the field

training was conducted by the lead technician."  (Kelly Decl. at ¶ 14-16.)  Plaintiff argues, in

addition, that whether they are promotions is an issue of fact.  (Pl.'s Mem. 15.)

Plaintiff's own declarations, however, do not by themselves designate specific facts to

show that there is a triable issue.  A disagreement about a material issue of fact is not enough to

preclude summary judgment.  <u>California Architectural Bldg. Prods. Inc. v. Franciscan Ceramics,</u>

<u>Inc.</u> 818 F.2d 1466, 1468 (9th Cir. 1987) ("No longer can it be argued that any disagreement

about a material issue of fact precludes the use of summary judgment.").  "[T]he nonmoving

party must set forth specific facts of a substantial nature, and conclusory or speculative

statements are insufficient to raise genuine issues of material fact."  <u>Kehdi v. BNSF Ry. Co.,</u>

2007 WL 2994600 at *4 (D. Or. 2007).  If the evidence is merely colorable or is not significantly

probative, summary judgment may be granted.  <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242,

249-50 (1986) (citing <u>Dombrowski v. Eastland,</u> 387 U.S. 82, 87 (1967) (<u>per curiam</u>); <u>First</u>

National Bank of Arizona v. Cities Services Co., 391 U.S. 253, 290 (1969)).

Plaintiff's primary assertions, that he believes he could perform the job duties and that the positions may not be promotions, standing alone, are not significant, probative evidence. Further, the foundation of Plaintiff's assertions is questionable at best because Plaintiff was a remote employee and worked from home in Klamath Falls, not in Medford where these positions were located. In addition, Plaintiff's statements regarding what he observed Mr. Klink perform as trainer are probative of what Mr. Klink did and do not necessarily stand for what the employer's job requirements were for that position.

Defendant presented job descriptions to support its arguments. Mr. Prill has shown that these positions were not suitable, and Plaintiff has not contradicted this evidence or shown that it is unreliable. There is no genuine issue of material fact as to whether the positions of trainer and field technical supervisor were not "suitable" positions.

**2.    Dispatcher Position**

Defendant argues that it had no obligation to reemploy the Plaintiff in the dispatcher position because it was not suitable or available during the time Plaintiff was eligible for reemployment. "Dispatchers are required to sit for periods that far exceed one hour and also are required to work ten hours in a single workday." (2nd Prill Decl. at ¶ 6.) The dispatcher position, however, was in Medford and thus not "as similar as practicable to the worker's former position in . . . location" to Plaintiff's Klamath Falls remote installer position. See Or. Admin. R. 39-006-0135(3).

In addition, when the Plaintiff was eligible for reemployment, the position was not available. At that time, the Medford dispatcher position had been eliminated and the company

Order    12

centralized the job functions in Portland.   (2nd Prill Decl. at ¶ 6; Def.'s Am. Reply 11-12.)

Plaintiff offers no evidence to show that there is a genuine issue of fact that the dispatcher position was suitable and available.  Plaintiff asserts in his declaration "No one from Ironwood has contacted me since August 5, 2006 to discuss the availability of work for me.  I believe the Trainer position, the Field/Technical Supervisor Position, and the Dispatcher Position all comply with my medical restrictions." (Kelly Decl. at ¶ 11.)  His assertions alone are not enough.  Exhibits to his declaration are the same job descriptions produced by the Defendant, and he has presented nothing to suggest a reasonably jury could find in his favor.  Because Plaintiff's restrictions would not permit him to perform the basic duties of the position, the position was outside of his geographic area, and the position was not available, Defendant did not violate Plaintiff's rights to reemployment by declining to offer Plaintiff the dispatcher position.

### 3.    Modified Quality Control Position[4]

Defendant argues that the modified quality control position that Plaintiff held from March 2006 to August 2006 was not a suitable, available position but was a temporary position created for Kelly.  In Oregon, employers are not required to create a suitable, available position for the worker, but if an employer does create such a position, it can be discontinued at any time.  Or. Admin. R. 839-006-0135(6)(a).

Defendant argues it had no obligations to create the light duty position and could discontinue it at any time. (Def.'s Am. Reply 8.)  Mr. Prill explained,

---

[4]  Plaintiff offers the job description of "Quality Control Technician" as one of the suitable, available positions as an exhibit to his Opposition to Defendant's Motion for Summary Judgment.  However, Plaintiff's arguments concern the Modified Quality Control position, and the Court focuses its analysis of that position in the context of its order.  Even if the Plaintiff argued that the Quality Control Technician was suitable, available position, he would not prevail because the job duties are clearly outside of his restrictions, requiring the employee to climb ladders and lift up to 75 pounds. (Post. Decl., Ex. H, 4.)

> I am not aware of any Ironwood employee receiving a permanent light duty position
> after suffering a permanent work-related injury. Rather, employees who suffer work-
> related injuries may be placed in temporary light duty positions for a short period of
> time as a temporary accommodation.  Temporary light duty allows employees to
> recover so that they can return to their regular jobs, but it is not intended to create a
> new, permanent job with a limited scope of job duties.

(Prill Decl. at ¶ 9.)

Plaintiff argues that the light duty position is not a temporary position but is a suitable,

available one that can only be eliminated for bona fide reasons.  According to the Plaintiff, "if an

employer eliminates a light duty [sic] 'at any time' the employer should be required to have a

bona fide reason, such as undue hardship, burden, or work is no longer available." (Pl.'s Mem.

11.)

Plaintiff relies on Mr. Prill's description of the position to support his contention that the

light duty position is suitable and available.  "[The quality control position] was not vacant at the

time.  Again, it's a position we use as a temporary light-duty position for people that are injured

and can't do the job that they - - " (Post Decl., Ex. A, 3.)  Plaintiff concludes from this statement

that because Defendant is able to provide such light duty positions at anytime to an injured

worker, the light duty position which he held cannot be considered temporary as there appears to

be a ready inventory of similar positions.  "[I]t is clear that Defendant has these positions

available for injured workers.  Furthermore, the same or similar light duty position, as provided

to Plaintiff in 2006, has been provided to other employees after August 5, 2006." (Pl.'s Mem.

11.)

Plaintiff makes the conclusion that because Defendant has the ability to have a modified

quality control position exist indefinitely, the position is not temporary and can be considered a

suitable, available position. Plaintiff, however, has not offered anything to support his conclusion. In theory, it is possible that several injured employees could hold this position consecutively such that the position operates as a permanent position. However, this possibility does not change it from being a temporary position. Defendant places individuals in modified quality control positions with duties tailored to the injured employees' needs, and it has no obligation to continue them. See Or. Admin. R. 839-006-0135(6)(a). Plaintiff has not provided evidence that calls this into question.

Defendant presented evidence that there is no genuine issue of material fact that there were suitable, available positions during the time that Plaintiff was eligible for reemployment. Viewing all evidence in the light most favorable to the Plaintiff, the court determines that the Plaintiff has not met his burden to present facts to show that the trainer, field technical installer, dispatcher, and modified quality control positions were suitable, available positions. There is no evidence that a reasonable jury could use to find that Defendant violated Plaintiff's right to reemployment.

**IV.    Defendant's Motion for Summary Judgment on the Retaliation Claim Is Denied**

Plaintiff asserts that Defendant discontinued his modified quality control position and reinstated him in the installer position in retaliation for Plaintiff's filed WC claim. He also argues that Defendant retaliated by refusing to offer suitable, available positions of trainer, field technical supervisor, and dispatcher. Because the court has already determined that there were no suitable, available positions during the period Plaintiff was eligible for reemployment, there is no triable issue here as to whether Defendant retaliated against the Plaintiff by failing to offer him these positions. See Sec. III.B.

Order    15

The remaining issue, then, is whether the Plaintiff can show that Defendant's decision to discontinue the modified quality control position and require Plaintiff to return to his position as an installer against his doctor's advice was a retaliatory act. Defendant argues that there is no genuine issue of material fact because it had a legitimate non-discriminatory reason for discontinuing the position and reinstating the Plaintiff as an installer.

### A.    An Employer Cannot Retaliate Against an Employee For Filing a Workers Compensation Claim

Oregon law protects employees who file workers compensation claims from unlawful employment practices. "It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits . . . ." Or. Rev. Stat. 659A.040(1).

If an employee believes that he has suffered discrimination, he may seek relief by first showing a *prima facie* retaliation claim. "To establish a prima facie case, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9thCir. 1998) (citing (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). "The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Id. (citing Wallis v. J.R. Simplot Co., 25 F.3d 885, 889 (9th Cir. 1994).

At minimum, the Plaintiff must show (1) that he engaged in a protected activity, such as filing a WC claim, (2) that he suffered an adverse employment action, and (3) that there is a causal link between his protected activity and the adverse action. 42 U.S.C. § 2000e; Hardie v.

Order   16

Legacy Health Sys., 167 Or. App. 425, 433, 6 P.3d 531 (2000).  To show a causal link, the plaintiff must show that a substantial factor in the alleged discrimination was that he invoked the workers compensation system.  A substantial factor is one that makes a difference in the decision.  "The crux of the standard . . . is whether, in the absence of the discriminatory motive, the employee would have been treated differently."  Id. at 435.

Once the plaintiff makes his *prima facie* case, the employer can challenge this claim by articulating a legitimate and nondiscriminatory reason for the adverse employment action.  If the employer succeeds, the plaintiff must then demonstrate that the employer's reason was merely a pretext for adverse action to survive summary judgment.  Manatt v. Bank of Am., N.A., 339 F.3d 792, 800 (9th Cir. 2003).

A plaintiff can show pretext in two ways.  He may directly persuade the court that the discriminatory reason more likely motivated the employer.  Or, he may indirectly show that the employer's proffered explanation is unworthy of credence.  Godwin, 150 F.3d at1220.  "Direct evidence is evidence which, if believed, proves the fact of [discriminatory animus] without inference or presumption."  Id. at 1221 (quoting Davis v. Chevron, U.S.A., Inc. 14 F.3d 1082, 1085 (5thCir. 1994)).  If there is no direct evidence available, a plaintiff can provide circumstantial evidence that is both specific and substantial.  Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1066 (9th Cir. 2004).  Evidence is sufficient if it is enough that a reasonable jury could determine the plaintiff would prevail under a preponderance of the evidence standard.  Id. at 1066-67.

Once the plaintiff has established a *prima facie* case, the court should be cautious in considering whether to grant summary judgment.  Summary judgment may be inappropriate once

Order   17

a *prima facie* case has been made:

> [e]ven if the defendant articulates a legitimate, nondiscriminatory reason for the
> challenged employment decision, thus shifting the burden to the plaintiff to prove
> that the articulated reason is pretextual, summary judgment is normally
> inappropriate.  When plaintiff has established a *prima facie* inference of disparate
> treatment through direct or circumstantial evidence of discriminatory intent, he
> will necessarily have raised a genuine issue of material fact with respect to the
> bona fides of the employer's articulated reason for its employment decision."

Sischo-Nownejad v. Merced Community College District, 934 F.2d 1104, 1110 (9th Cir. 1991)

(citations omitted).  In Stegall, the 9th circuit commented, "[i]n the end, the inquiry is

straightforward:  put simply the plaintiff . . . may establish a violation through a preponderance

of the evidence (whether direct or circumstantial) that a protected characteristic played a

motivating factor.  Even at summary judgment, it is important not to lose sight of the ultimate

question that will be before the court, should the plaintiff survive summary judgment."  (internal

citations omitted) 350 F.3d at 1068; see Costa v. Desert Palace, 299 F.3d 838, 851 (9th Cir.

2002).

**B.     Plaintiff Has Shown There Is a Genuine Issue of Fact Regarding Defendant's
        Decision to Reinstate the Plaintiff**

Plaintiff argues that Defendant retaliated against him for filing a WC claim.  Defendant

offers its legitimate, non-discriminatory reason for immediately reinstating the Plaintiff, but

Plaintiff argues this was only a pretext.

**1.     Plaintiff's *Prima Facie* Claim**

Plaintiff has made a *prima facie* claim for retaliation.  He engaged in a protected activity

when he filed a claim for workers compensation in December 2005.  He experienced an adverse

employment action on August 5, 2006, when his employer discontinued the modified quality

control position and required him to return to a position that his doctor believes was not suitable for his limitations.

The evidence of retaliation is not overwhelming in Plaintiff's favor. However, Plaintiff presents evidence that there was a causal connection between filing his WC claim and the adverse action. He points to Ms. Chiku's frustration with his claim and her testimony in deposition in which she stated that she believed Plaintiff was taking advantage of the workers compensation system. In addition, Plaintiff acknowledged that he had previously filed WC claims. (Kelly Decl. at ¶3.) Plaintiff argues this is evidence that the decision to reinstate him is related to his WC claim because Defendant was looking for a way to get rid of a troublesome employee. (Post Decl., Ex. B, 15-16 & 6-7.)

Defendant argues that there is no causal connection, asserting that the protected activity is Plaintiff's appeal of his WC claim, which occurred August 28, 2006, after the Defendant reinstated him in the installer position on August 5, 2006. Because the protected activity occurred after the adverse action, Defendant, argues, there can be no causal connection. (Def.'s Am. Reply 13.) However, the protected activity here includes the invocation of the workers compensation system when Plaintiff filed his claim in December 2005 as well as appealing the claim's closure in August 2006.

### 2.    Defendant's Non-Discriminatory, Legitimate Reason

The Defendant offers a legitimate and non-discriminatory reason for the adverse employment action to meet its burden in the summary judgment test. Defendant explains that it only reinstated Plaintiff to the installer position after an IME determined his compensable conditions were medically stable. Both parties agree that on May 19, 2006, Dr. McNeill

Order   19

concluded that Plaintiff's compensable conditions of cervical and thoracic strains were medically

stationary. (Mora Decl. Ex. 13, 9.) Dr. Reischer also confirmed that these two compensable

conditions were medically stable. (Post Decl., Ex. P, 2.) Defendant asserts that it followed the

appropriate procedures as set forth in Oregon law and once the claim was properly closed it had

no obligation to provide light duty work.[5] (Def.'s Am. Mem. in Supp. of Mot. for Summ. J.

(Def.'s Mem. in Supp.) 20.)

Defendant also suggests as a reason that the modified quality control position was only a

temporary, created position and could be discontinued at any time. "It is hard to imagine how

Plaintiff can claim Ironwood retaliated against him merely be asking the plaintiff to return to

work, discontinuing a light duty position that it was *not* obligated to provide . . . ." (Def.'s Am.

Mem. in Supp. 20.) See Or. Admin. R. 839-006-0135(6)(a). Even though Defendant was not

obligated to provide this position, Oregon law does not allow an employer to discriminate with

respect to any term or condition of employment, which prohibits terminating even a temporary,

created position because of a discriminatory motive.

### 3.    Plaintiff's Evidence of Pretext

Plaintiff argues that the IME report was merely a pretext. "Defendant's offered

explanation for revoking Plaintiff's light duty position was merely a pretext to retaliate against

---

[5] "To close a claim an employer must issue a notice of closure when medical information establishes that there is sufficient information to determine the extent of the permanent disability and indicates that the worker's compensable condition is 'medically stationary.'" Or. Admin. R. 436-030-0020. An employee is "medically stationary" when one of the following occurs: (1) the attending physician . . .or a preponderance of the medical opinion declares the worker "medically stationary; (2) if there's a conflict in medical opinions, more weight is given to medical opinions that are based on the most accurate history, on the most objective findings, on sound medical principles, and clear and concise reasoning; or (3) where there is not a preponderance of medical opinion stating a worker's compensable condition is or is not medically stationary, deference will generally be given to the opinion of the attending physician. Or. Admin. R. 436-030-0035.

him and attempt to get rid of an employee who they thought was taking advantage of the workers'

compensation system. . . . Defendant looked for an available excuse to end Plaintiff [sic] light

duty position and that excuse was Dr. McNeill's IME report." (Pl.'s Mem. 14-15.)  Plaintiff

presents evidence meeting the requisite standard to suggest that a discriminatory reason more

likely motivated Defendant. This evidence makes Defendant's reason for its employment action

less credible.

First, it is apparent that Defendant was frustrated with Plaintiff and believed he was

taking advantage of the workers compensation system. On February 16, 2006, Ms. Chiku emailed

Ms. Wood to update her on the status of Plaintiff's light duty position and wrote "I won't be

surprised if he retains counsel on this issue." Records also indicate that as early as March 2006,

the Defendant had expressed this frustration to its insurer. Liberty's claim notes state, "Clt is

working modified but [employer] seems frustrated with him not doing his regular work." (Post.

Decl., Ex. N.)  Ms. Chiku also emailed Mr. Prill and Ms. Wood on July 11, 2006, explaining

that Plaintiff's claim would be closed: "[l]itigation is anticipated with this claim as more than

likely James will disagree with the IME position and push to have the thoracic symptoms added

to this claim." (Post. Decl., Ex. L.)

Ms. Chiku also stated that she felt Plaintiff was taking advantage of the system.

Plaintiff's attorney asked Ms. Chiku, "[D]id you believe he was taking advantage of the situation

or not?" and upon an affirmative response, he inquired, "what made you believe he was trying to

take advantage of the situation?" She answered,

> Noncommunication.  When trying to comply with some of his responsibilities of
> timely submitting - -  when he was on light duty, it was said to him he had to submit
> his time sheets timely, follow up medically and let us know what's going on, and he

Order   21

wasn't compliant with that. So it was frustrating from that standpoint. And as long as we didn't have any medical documentation to assist us with managing and evaluating – and assessing the claim, you know, he would have - - he would continue to be on light duty benefits.

(Post Decl., Ex. B, 15-16.)

Defendant argues that there is nothing to support an allegation of pretext from a few statements about an anticipatory appeal of the WC claim. Defendant notes, "Oregon law does not support a retaliation claim for this kind of remark" (Am. Def.'s Reply 14), citing Smith v. Consolidated Personnel Corporation, an unreported district of Oregon case. WL 2000 WL 294076 (D. Or.). In Smith, the court explained, "employers have a right to contest claims filed against them" and refused to find that an employer's defense of a retaliation claim was evidence of retaliation.  Id. at *5

However, Kelly has offered more evidence here than just Ms. Chiku's verbalized frustration. Her stated belief that Plaintiff was using the system coupled with her frustration is unlike the situation in Smith in which the defendant was merely acknowledging its right to defend itself.  In addition, Mr. Prill expressed similar frustrations.  Plaintiff claims that Mr. Prill told him that the company did not care about his medical restrictions. (Kelly Decl. at ¶8-9.) There is enough evidence here that a reasonable jury could conclude Defendant had other reasons for reinstating Plaintiff under these circumstances.

Second, the choice of Defendant to push through Plaintiff's reinstatement even though it knew his doctor disagreed casts some doubt on the Defendant's credibility.  Though the WC claim was closed regarding Plaintiff's two compensable injuries, Dr. Reischer was still concerned that Plaintiff was unable to work because of other accident-related injuries that Liberty had not

Order   22

yet accepted.  Defendant knew of her medical opinion because Dr. Reischer independently

explained her disagreements with the IME in a letter to Liberty in June 23, 2006 which Liberty

shared with Ms. Chiku.  (Post Decl., Ex. F.)  Dr. Reischer also responded to Ms. Patterson's July

5, 2006 letter which sought claim closure information, pursuant to Or. Admin. R. 436-010-

0280(3),[6] and further stressed her opinion.  On July 11, 2006, Ms. Patterson recorded in her case

notes that she had received Dr. Reischer's letter and had communicated its contents to Ms. Chiku.

In response to Dr. Reischer's concerns, Plaintiff argues, Liberty only reviewed the IME report for

existence of the herniations and did not request the most recent MRI.  In her case notes, Ms.

Patterson states, "IME states his MRI is completely normal, no evidence of the disk [sic]

herniation, and this is not an accepted condition."  (Post Decl., Ex. O.)

Plaintiff contends that Defendant failed to consider fully his claimed disc herniation and

his medical restrictions before reinstating him to his former position.  Plaintiff points out that

before reinstating him, neither Defendant nor Liberty asked Dr. McNeill to review the Plaintiff's

post-IME thoracic MRI, even though Dr. Reischer clearly stated in her June letter that this second

MRI showed disc herniations.

Defendant relies on the claim closure as its legitimate reason for its actions, and Liberty

did follow the procedures in closing Plaintiff's claim.  However, Plaintiff has shown there may

be a question as to why Defendant was so quick to reinstate him in the installer position knowing

that his doctor disagreed.  Arguably, the Defendant should have known that Plaintiff would have

---

[6] Or. Admin. R. 436-010-0280(3) provides, "[w]hen an attending physician requests a consulting physician
to do the closing exam, the consulting physician has seven days from the date of the exam to send the report for the
concurrence or objections of the attending physician. The attending physician must also state, in writing, whether
they agree or disagree with all or part of the findings of the exam. Within seven days of receiving the report, the
attending physician must make any comments in writing and send the report to the insurer."

Order   23

no other choice but take a leave of absence because he could not work.

A reasonable jury could determine from this evidence that Plaintiff's workers compensation claims history was a motivating factor in Defendant's decision to reinstate him and discontinue the modified quality control position. Defendant's motion for summary judgment on this issue is denied.

## VII.    Conclusion

Defendant's motion for summary judgment on the issue of violation of Plaintiff's reemployment rights is granted. Plaintiff has not shown that there is a genuine issue of material fact as to whether there were suitable, available positions. Defendant's motion for summary judgment on the issue of retaliation against Plaintiff for filing a WC claim is denied. Plaintiff has made a *prima facie* case for retaliation, and he has presented enough evidence that a reasonable jury could determine that Plaintiff's protected activity of filing a WC claim was a motivating factor in Defendant's adverse employment decision.

DATED this ___30___ of April, 2009.

Mark D. Clarke
United States Magistrate Judge

Order   24